IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-00363-01-CR-W-FJG |
| | ) | |
| MICHAEL J. ALEXANDER, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Michael Alexander's Motion to Suppress. For the reasons set forth below, it is recommended that this motion be denied.

## I. INTRODUCTION

On October 19, 2006, the Grand Jury returned a nine count indictment against defendant Michael J. Alexander. Counts One through Eight of the indictment charge defendant with receipt of child pornography over the internet. Count Nine charges defendant with possession of child pornography.

On May 16, 2007, an evidentiary hearing was begun on defendant's motion to suppress. Defendant Alexander was represented by retained counsel Thomas J. Bath, Jr., and Robin D. Fowler. The Government was represented by Assistant United States Attorney Katharine Fincham. The Government called Detective Catherine Johnson, Detective Brian Roach and Officer Howard Periman of the Kansas City, Missouri Police Department as witnesses. The defense called Detective Maggie McGuire of the Kansas City, Missouri Police Department, Lisa Cole and defendant Michael Alexander to testify. The Government recalled Detective Maggie McGuire to testify.

The hearing concluded on August 17, 2007. The Government called Detective Brian Roach and Detective Maggie McGuire as witnesses.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the

following proposed findings of fact:

1.  The victim ("JC") reported to the Kansas City, Missouri Police Department that she had been videotaped in the nude without her consent at defendant Alexander's residence. (Tr. I[1] at 18, 47) Officers conducted an interview with JC and then obtained a formal statement from her. (Tr. I at 20) The formal statement was given at 5:22 p.m. on October 14, 2006. (Tr. I at 38; Defendant's Ex. CC) The Statement provides in part:

    > Q.   Please describe to me the events that brought you to police headquarters today.
    >
    > A.   I was contacted by Mark McNeil saying there might be some videotapes of me at Michael's house. He said Michael may have videotaped me without my consent. Then Mark gave me Michael's current girlfriend's phone number and said we should talk. I contacted [ES] who told me she found a hidden camera in Michael's bedroom. She pushed some buttons and viewed videotapes, women nude and women having sex with him. She also viewed a tape of me. She hasn't met me but Mark described what I looked like and I described what I looked like. She said the videotape she saw of me I was nude but she did not watch the entire video to see if we were having sex.

    (Defendant's Ex. CC) After receiving the complaint from JC, Detective Catherine Johnson conducted a telephone interview with ES at 6:30 p.m. on October 14, 2006. (Tr. I at 19-20, 40-42; Defendant's Ex. DD) The police were focusing on the crime of invasion of privacy as a possible offense in this case. (Tr. I at 18-19)

2.  The Missouri statutes regarding invasion of privacy and definitions applicable to it provide:

    ### 565.252. Invasion of privacy, first degree–photographs, films, videotapes

    1.  A person commits the crime of invasion of privacy in the first degree if such person:

    (1) Knowingly photographs or films another person, without the person's knowledge and consent, while the person being photographed or filmed is in a state of full or partial nudity and is in a place where one would have a reasonable expectation of privacy, and the person subsequently distributes the photograph or film to another or transmits the image contained in the photograph or film in a manner that allows access to that image via a computer; or

    (2) Knowingly disseminates or permits the dissemination by any means, to another person, of a videotape, photograph, or film obtained in violation of subdivision (1) of this subsection or in violation of section 565.253.

    * * *

---

[1]"Tr. I" refers to the transcript of the hearing held on May 16, 2007.

2

**565.253. Invasion of privacy, crime, penalty**

1.  A person commits the crime of invasion of privacy in the second degree if:

(1) Such person knowingly views, photographs or films another person, without the person's knowledge and consent, while the person being viewed, photographed or filmed is in a state of full or partial nudity and is in a place where one would have a reasonable expectation of privacy; or

(2) Such person knowingly uses a concealed camcorder or photographic camera of any type to secretly videotape, photograph, or record by electronic means another person under or through the clothing worn by that other person for the purpose of viewing the body of or the undergarments worn by that other person without that person's consent.

\* \* \*

**565.250. Definitions–invasion of privacy ...**

As used in sections 565.250 to 565.257, the following terms mean:

(1) **"Full or partial nudity"**, the showing of all or any part of the human genitals or pubic area or buttock, or any part of the nipple of the breast of any female person, with less than a fully opaque covering;

(2) **"Photographs"** or **"films"**, the making of any photograph, motion picture film, videotape, or any other recording or transmission of the image of a person;

(3) **"Place where a person would have a reasonable expectation of privacy"**, any place where a reasonable person would believe that a person could disrobe in privacy, without being concerned that the person's undressing was being viewed, photographed or filmed by another;

\* \* \*

(6) **"Views"**, the looking upon of another person, with the unaided eye or with any device designed or intended to improve visual acuity, for the purpose of arousing or gratifying the sexual desire of any person.

(Government's Ex. 1)

3.      Detective Johnson prepared an Affidavit/Application for Search Warrant for defendant Alexander's residence.  The affidavit provides in part:

On 10/14/2006 the victim, a thirty-one year old female, reported to officers of the Kansas City Missouri Police Department that her ex-boyfriend,

3

Michael J. Alexander, W/M, 08/15/1963, had taken videos[2] of her in the nude without her consent at his residence, 6215 Morningside Drive, Kansas City, Jackson County, Missouri.

The victim stated in mid-May 2006 she observed a small camera hidden in a plant on top of an armoire in the suspect's bedroom. The victim stated the camera was pointed directly at the bed. When confronted the suspect denied videotaping her in the nude or while engaging in sex. The victim said on 10/12/2006 she was contacted by the suspect's new girlfriend who stated she had located a video of the victim[3] in the suspect's hot tub[4] in the nude.[5] The victim advised the suspect has a reputation for dating multiple woman [sic] at the same time and often on the same night. The victim did not know the names or contact information for the other women the suspect dated.

The witness advised detectives on 10/12/2006 she located a video camera hooked up to a recording device which displayed on the television in the suspect's bedroom along with unlabeled VHS videos and DVDs. The witness played the VHS videos and DVDs,[6] observing the suspect with three different women in various locations in and around his house in the nude as well as performing sexual acts. The witness also located a VHS video labeled "Ray" in the armoire. The video was of a friend of the suspect

---

[2]JC actually reported that she had been told that a single video had been found of her in the nude. (Tr. I at 47)

[3]At the time this affidavit was executed, ES had not yet confirmed that the woman she saw in the video was JC. (Tr. I at 49) Detective Johnson testified that she did not have time to meet with ES yet that night because the search warrant needed to be executed before midnight. (Tr. I at 49) Detective Johnson felt there was a risk that evidence might be destroyed given that ES had contacted a third party who might notify defendant Alexander. (Tr. I at 50) According to Detective Johnson, given that the potential evidence in the residence could be destroyed very quickly, the officers felt it was necessary to take the information that they had, execute the search warrant and then get a formal statement from ES the following morning. (Tr. I at 49) The third party also was not contacted that evening because time was of the essence. (Tr. I at 50)

[4]No effort was made by the police to determine whether someone could be viewed from other houses if they were in the hot tub or getting into the hot tub. (Tr. I at 59)

[5]ES advised Detective Johnson that the video showed not only JC naked getting into the hot tub, but also defendant Alexander naked getting into the hot tub. (Tr. I at 56)

[6]The Investigative Report of the telephone interview of ES states that ES played several of the videotapes in the VCR. (Defendant's Ex. DD) ES noted there were several unlabelled DVDs in the armoire, but the Report does not state that ES played any of the DVDs. (Defendant's Ex. DD) Detective Johnson testified that ES must have told her that she also viewed the DVDs, otherwise Detective Johnson would not have stated this in the Affidavit. (Tr. I at 51) In a later interview, ES told Detective Johnson that the DVDs she viewed only contained images of the hot tub with no one in it. (Tr. I at 51-52; Defendant's Ex. BB) Detective Johnson testified that she did not intend to mislead the judge into believing that sexual acts or nudity were found on the DVDs. (Tr. I at 52-53)

4

engaging in sexual activity with an unknown female. The witness stated she located a second video camera hidden[7] in the lattice work above the hot tub in the suspect's back yard. The witness stated she believed a third camera was located near the pool and lounging chairs based on one of the videos. The witness stated it did not appear that any of the people in the videos were aware they were being video-taped. The witness stated she did not know the names or contact information for the people portrayed in the videos or the women the suspect dated. The witness said on an unknown date[8] the suspect attempted to take a photograph of her performing oral sex on him with a digital camera. The witness became upset, telling the suspect to delete the photo. When the witness checked the camera at a later time, the picture was no longer visible on the camera screen.

(Government's Ex. 2)

4.    Judge Midkiff signed a Search Warrant for defendant Alexander's residence at 10:43 p.m. on October 14, 2006. (Tr. I at 21; Government's Ex. 3) The Search Warrant authorized officers to search for and seize the following property:

Digital storage devices consisting of all such equipment designed to collect, analyze, create, display, convert, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data, to include but are not limited to desktop/laptop/hand held computers, PDA's (Personal Data Assistants), cellular telephones, pagers, digital cameras/camcorders and CCD concealable digital surveillance cameras and recorders, all of which may be hard-wired or wireless in operation and function;

Internal and peripheral storage devices, such as hard drives, floppy disks, zip disks, DVD-R/+R/RW and RAM, CR-R/CD-RW disks, data cartridges, compact flash memory cards, memory sticks, USB drives and other like magnetic media and non-volatile memory storage devices;

Peripheral input-output devices, such as a hard-wired and/or wireless network router, mouse, keyboard, printers, fax machine, digitizing tablet, stylus, scanner, video display monitor, head mounted displays, optical readers and reproducing devices capable of interfacing with computers and related communications devices that can be used to transmit or receive information to or from a computer.

Photographs,[9] including still photos, negatives, videotapes, DVD's, films,

---

[7]In her telephone interview, ES actually stated that she located a camera on the lattice work above the hot tub and that the camera was very small and not easily visible. (Tr. I at 54; Defendant's Ex. DD)

[8]ES had actually said this incident occurred earlier in the week. (Tr. I at 58; Defendant's Ex. BB)

[9]Detective Johnson testified that she believed the term "photographs" gave the officers permission to seize any photographs that appeared to have been taken without the consent of the party being photographed, that is photographs that pertained to the invasion case. (Tr. I at 104)

undeveloped film and the contents therein and slides;

Any papers, correspondence, receipts or documents related to the victim;

Indicia of occupancy, residency, ownership, management and/or control of the premises or property described above including, but not limited to utility and telephone bills, and canceled envelopes. Day Planner and address book.

(Government's Ex. 3)

5.  After Detective Johnson obtained the search warrant, she went to the Metro Patrol Station and contacted the Tactical Response Team to do a debriefing before the execution of the warrant. (Tr. I at 22) Detective Johnson went with the Tactical Response Team and drove by the house to confirm that the information on the search warrant corresponded with the house. (Tr. I at 22) Detective Johnson explained to the Tactical Response Team the reason that the officers were conducting the search warrant and what the probable cause was for it. (Tr. I at 22) Detective Johnson showed the Tactical Response Team a picture of the defendant and advised that if he was in the residence, he was to be taken into custody on a 24-hour hold to be questioned with regards to invasion of privacy. (Tr. I at 22) Detective Johnson testified that she believed there was probable cause to arrest defendant Alexander. (Tr. I at 22)

6.  The Missouri statute allowing for arrest without a warrant provides:

**544.216. Powers of arrest–arrest without warrant, of suspicious persons violating any law of state including misdemeanors and ordinances ...**

Any sheriff or deputy sheriff, any member of the Missouri state highway patrol, and any county or municipal law enforcement officers in this state ... may arrest on view, and without a warrant, any person the officer sees violating or who such officer has reasonable grounds to believe has violated any law of this state, including a misdemeanor or infraction, or has violated any ordinance over which such officer has jurisdiction. ... The power of arrest authorized by this section is in addition to all other powers conferred upon law enforcement officers, and shall not be construed so as to limit or restrict any other power of a law enforcement officer.

(Government's Ex. 4)

7.  The Missouri statute allowing for a 24-hour detention on arrest without a warrant provides:

**544.170. Twenty-four hours detention on arrest without warrant ...**

1.  All persons arrested and confined in any jail or other place of confinement by any peace officer, without warrant or other process, for any alleged breach of the peace or other criminal offense, or on suspicion thereof, shall be discharged from said custody within twenty-four hours from the time of such arrest, unless they shall be charged with a criminal offense by the oath of some credible person, and be held by warrant to answer to such offense.

6

2. In any confinement to which the provisions of this section apply, the confinee shall be permitted at any reasonable time to consult with counsel or other persons acting on the confinee's behalf.

* * *

(Government's Ex. 5)

8.      After the debriefing, the Tactical Response Team drove to defendant Alexander's residence. (Tr. I at 23) It was approximately 11:00 p.m. (Tr. I at 152) A television was on in the living room area. (Tr. I at 152-153) Officer Howard Periman testified that the Tactical Response Team made its presence known by knocking on the door and announcing, "Police, Search Warrant," loudly and repeatedly. (Tr. I at 151) The officers waited approximately fifteen seconds and then forced the door open with a ram. (Tr. I at 151) Just inside the door, Officer Periman encountered a male party (later identified as defendant Alexander). (Tr. I at 151) Officer Periman ordered Alexander to the ground at least three times, but he did not comply and continued to back up. (Tr. I at 151-152) As Officer Periman went by he pushed Alexander out of his way. (Tr. I at 151, 154) Alexander hit a chair and fell to the ground. (Tr. I at 151) Officer Periman continued to secure the residence and make sure that no one else was in the residence. (Tr. I at 152) Officer Periman testified that the Tactical Response Team secures a residence by speed, surprise and violence of action. (Tr. I at 154) Once they enter a residence, there is no stopping. (Tr. I at 154) They continue forward motion through the house until the entire residence is secure. (Tr. I at 154) They do this for the safety of themselves and the safety of the people in the residence. (Tr. I at 154) They do not want to allow anyone time to barricade themselves or hide. (Tr. I at 154) After the Tactical Response Team determines that a residence is safe, they turn it over to the investigative element. (Tr. I at 152)

9.      Detective Johnson and other officers parked a few houses down from the residence. (Tr. I at 23-24) Detective Johnson entered the residence after the Tactical Team gave the all's clear signal. (Tr. I at 60) When she entered the residence, Detective Johnson noticed that the front door jamb had been damaged. (Tr. I at 24) Defendant Alexander was in custody. (Tr. I at 24) The Tactical Unit advised that Alexander had not immediately complied with their orders. (Tr. I at 24) Detective Johnson advised the Tactical Unit to get a patrol wagon to transport the defendant to headquarters. (Tr. I at 24) Detective Johnson, Detective Shirley Williams and Sergeant Freid then executed the search warrant. (Tr. I at 24, 61) Cameras were located in the backyard. (Tr. I at 60) The wires on those cameras were traced to a locked room in the basement that contained monitors and recording equipment. (Tr. I at 60) A camera located in the bedroom was attached to a portable DVD/VCR. (Tr. I at 60) None of the cameras were hooked up to any type of computer. (Tr. I at 61) A laptop computer was located in the office. (Tr. I at 61)

10.     The following items were seized during the execution of the search warrant on October 14:

        Daewoo Television Serial #GT36EA2373 Model #DTQ13V5FC
        Dell Inspiron laptop computer Serial #0107899029300375 with power cord
          and camera adaptor
        512 Magabute camera disk
        Blackberry T-Mobile telephone

7

Cannon PC1150 digital camera Serial #0723355939 with memory card inside
Credit card statements
2.4 GHZ High speed wireless cordless adaptor DWL-G650 BN2K443009803
Day Planner and notebook
Cables to connect DVD player to Receiver
Power cords
Photographs
Negative of photographs
Canera Ricoh 35 mm camera YF-20N
Minolta Maxxum 33 mm camera 430SI RZ Serial #96804854
Kodak Gold film
Receipts
San Dish Cruzer 1.0 GB memory stick
Three remote controls for television/VCR
Black bag
Sharp TV/VCR combo Model #13VT-H60 Serial #576596
Sanyo VCR Model #VWM-900
Panasonic VHS/DVD recorder Model #DMR-ES40V Serial #LJ5LC005404
Sony audio/video receiver Serial #8845734
Toshiba TV/VCR combo Model #MV13P3 Serial #79406480B
Magazine
4 small cameras with wires
44 VHS tapes
62 DVDs
4 8mm videotapes
Multiple new recordable DVDs

(Government's Ex. 6)

11. Government's Exhibit 22 consists of photographs of what appears to be an adult female (Jane Doe #1) who is naked and appears to be passed out and in two different positions. (Tr. I at 25) Loose images of Jane Doe #1 were recovered from defendant Alexander's office on the second floor of his residence. (Tr. I at 25-26) In addition to potential evidence of invasion of privacy, the officers discovered potential evidence of another offense, that is, possession of child pornography. (Tr. I at 26) Government's Exhibits 7 and 31 consist of photographs of what appear to be juveniles naked that were recovered from defendant's residence. (Tr. I at 26, 86) The photographs of apparent juveniles have websites typed on them, which would indicate that they were obtained from the internet. (Tr. I at 80) The police also recovered from defendant's residence evidence regarding an online subscription to a child pornography website. (Tr. I at 27-30; Government's Exs. 8b, 8c and 9) Based on the discovery of child pornography in the attic, the officers' search expanded into the area of child pornography. (Tr. I at 69)

12. Defendant Alexander was taken to police headquarters shortly after midnight. (Tr. I at 33) Detective Johnson next saw defendant at approximately 6:00 in the morning. (Tr. I at 33) Detective Johnson and Detective Williams took Alexander to an interview room. (Tr. I at 34) Detective Johnson first conducted an interview which consisted of a questionnaire of basic biographical information. (Tr. I at 34) Detective Johnson then gave Alexander a Miranda Waiver form and asked him to read the form aloud. (Tr. I at 35) Alexander read the form aloud. (Tr. I at 36) Detective Johnson testified that Alexander was alert and cooperative. (Tr. I at 35)

8

Alexander was not threatened nor were any promises made to him to get him to talk. (Tr. I at 35) Alexander signed the Miranda Waiver at 6:08 a.m. on October 15, 2006, and agreed to talk to the officers. (Tr. I at 35; Government's Ex. 11) Detective Johnson showed Alexander the pictures of young girls that had been retrieved from his attic and Alexander referred to them as art. (Tr. I at 37) He stated that he appreciated the human body in all its forms. (Tr. I at 37) Alexander told Detective Johnson that it is sometimes difficult to tell a girl from a woman. (Tr. I at 37) Alexander said he obtained the pictures from the internet and that he subscribed to all kinds of websites looking for art. (Tr. I at 37) Alexander stated that he did not think that society would look at the pictures the same way that he did. (Tr. I at 38) Alexander declined to give a written statement. (Tr. I at 36; Government's Ex. 11) The interview concluded at 8:00 a.m. (Government's Ex. 11)

13.     ES responded to police headquarters at approximately 9:00 a.m. on October 15, 2006. (Defendant's Ex. DD) ES provided a signed statement at 9:31 a.m. (Defendant's Ex. BB) ES advised Detective Johnson that she had been told by an outside resource that there were numerous porn sites on defendant Alexander's computer history and that the porn encompassed everything from hard core pornography to child pornography. (Defendant's Ex. BB)

14.     Electronic media recovered from defendant Alexander's house was taken to police headquarters. (Tr. I at 32) The TVs, VCRs and film cameras were taken to the property room. (Tr. I at 32) The digital camera and the computer were turned over to Detective Roach. (Tr. I at 32) Detective Roach was asked to review the digital camera and the computer for any evidence of invasion of privacy. (Tr. I at 32) Detective Roach was advised of the recovery of apparent links to child porn. (Tr. I at 32) Detective Roach reviewed the first search warrant. (Tr. I at 110) Detective Roach was to look for any evidence attributed to the cameras that were mounted throughout Alexander's residence. (Tr. I at 110) Detective Roach said he would review the computer for invasion of privacy evidence and that if anything else was located, an additional search warrant would need to be obtained. (Tr. I at 32-33) At approximately 8:45 a.m., Detective Roach conducted a preview of Alexander's hard drive. (Tr. II[10] at 5) Detective McGuire was sitting next to Detective Roach when he conducted the preview. (Tr. II at 30-31) Within minutes, Detective Roach came across what appeared to him to be child pornography containing images of girls that had been identified as children in other cases. (Tr. I at 33, 113) Detective Roach stopped his search after two or three child pornography images popped up and told Detective Johnson that it would be best if they obtained a search warrant for child pornography. (Tr. I at 33, 113, 141) Detective McGuire testified that after Detective Roach discovered child pornography, he stopped the preview. (Tr. II at 31) Detective Roach's subsequent review of his hard drive supports Roach's recollection that he only examined Alexander's computer for a short time and did not print any images because Detective Roach's subsequent review shows that no document was created (which would have been created had Roach printed an image) and he was not on for a sufficient time to create a backup (which would have been created had Roach examined the computer for up to seven or ten minutes). (Tr. II at 5-10, 23-25)

15.     A second search warrant was obtained for defendant Alexander's house to search for evidence of child pornography. (Tr. I at 33) Detective Brian C. Walton signed the

------

[10]"Tr. II" refers to the transcript of the hearing held on August 17, 2007.

Affidavit/Application for Search Warrant. The affidavit is identical to the earlier affidavit with the addition of one sentence:

> Det. Brian Roach conducted a preview of the computer recovered from 6215 S. Morningside Drive and located child pornography, some of which Det. Roach knows as previously identified child victims.

(Government's Ex. 23) Detective Walton also signed an Affidavit/Application for Search Warrant to search for evidence of child pornography on the storage media seized from defendant's residence. (Government's Ex. 26) The probable cause given in the affidavit is identical to the affidavit given to support the second search of defendant's residence. (Government's Ex. 23; Government's Ex. 26)

16.  Judge Midkiff signed the second Search Warrant for defendant Alexander's residence at 1:06 p.m. on October 15, 2006. (Government's Ex. 24) The search warrant authorized officers to search for and seize the exact property set forth in the original search warrant. (Government's Ex. 3; Government's Ex. 24) Judge Midkiff signed the Search Warrant for the storage media at 1:06 p.m. on October 15, 2006. (Government's Ex. 27) The search warrant authorized the officers to search the following property for evidence of child pornography:

> Cameras to include film and digital media
> 5 video cameras w/ wires
> 3 televisions, 2 with wires attached
> VCR
> DVD/VCR combination
> Audio receiver/recorder
> VHS Videotapes
> DVD Videos
> DVD-Rs
> 8mm tapes
> Photographs and negatives
> Dell Laptop
> Digital camera disk
> Blackberry telephone

(Government's Ex. 27)

17.  Detective Roach participated in the second search of defendant Alexander's residence. (Tr. I at 114)

18.  The following items were seized from defendant Alexander's residence during the execution of the search warrant on October 15:

> 100 VHS TAPES
> 8 MISC. PHOTOGRAPHS
> 2 MISC. PAPERS
> BLACK BAG W/ WOMAN'S PANTIES
> 4 ROLLS UNDEVELOPED FILM FOR CANNON CAMERA
> MOTOROLA ROUTER #14610142706140700100
> 1 CANNON MEMORY CARD
> 3 CD's

10

(Government's Ex. 25)

19. Detective Maggie McGuire and Detective Roach responded to the Detention Unit to conduct an interview of defendant Alexander. (Tr. I at 156; Defendant's Ex. EE) Detective McGuire signed Alexander out of the jail on the eighth floor at 5:55 p.m. on October 15, 2006, and took him to an interview room on the second floor. (Tr. I at 156-157, 199, Government's Ex. 33) Neither Detective McGuire nor Detective Roach remember whether Detective Roach was in the interview room with Alexander. (Tr. I at 134-135, 158-159) Alexander stated that his lawyer had advised him to not speak about the incident. (Defendant's Ex. EE) Alexander refused to make any statements regarding his possession of child pornography. (Defendant's Ex. EE) Detective McGuire testified that she then took Alexander back to the jail. (Tr. I at 202) Alexander was checked back into the Detention Unit at 6:42 p.m. (Defendant's Ex. EE; Government's Ex. 33) Detective McGuire attributes the delay to the fact that detention officers were being trained and that the retrieval time slows down during the dinner hour. (Tr. II at 29-30)

20. Defendant Alexander testified that after he indicated he did not want to make a statement, Detective McGuire left the room for a few minutes and then came back with Detective Roach. (Tr. I at 191) According to Alexander, Detective Roach had a stack of papers with approximately 200 images of children on them. (Tr. I at 192-193) The majority of sheets contained four photos. (Tr. I at 195) Alexander testified that Detective Roach showed him the photos and stated that he recognized someone from one of the photo series and said that he had helped to prosecute them. (Tr. I at 192) Alexander testified that Detective Roach told him that this was really bad and that it could go to federal court. (Tr. I at 193) Detective Roach testified that given the format he uses when printing out child pornography images to show a defendant during questioning, there would not be enough room on the paper to put four photos. (Tr. II at 12) Detective Roach testified that if he had printed out images from Alexander's laptop, he would have given them to Detective McGuire because it was her investigation. (Tr. II at 14) Detective McGuire testified that she did not receive a set of printed images from Detective Roach. (Tr. II at 33) Detective McGuire testified that she did receive a set of printed-out images (nine pages total), many of which were arranged four on a page, from the Sex Crimes detectives. (Tr. II at 33-34) Detective McGuire has no recollection of handing Alexander any images that came from the laptop computer. (Tr. I at 160) Detective Roach has no recollection of ever meeting Alexander. (Tr. II at 17)

21. Additional search warrants were obtained for defendant Alexander's vehicle and place of business on October 17, 2006. (Government's Ex. 36; Defendant's Ex. E) Kimberly Shirley-Williams signed an Affidavit/Application for Search Warrant for each of the search warrants. The affidavits each begin with all the information set forth in Detective Johnson's first affidavit for search warrant for Alexander's residence and then provide additionally:

> A search warrant was obtained and executed on 10/14/2006. Four surveillance cameras were located in the back yard of the residence. All four surveillance cameras were hidden from plain view. A fifth surveillance camera was located in the master bedroom of the residence wrapped in a black cloth with a baseball cap resting on top. The lens was pointed directly at the bed and was able to capture the image without manipulating the cloth or baseball cap. Numerous photographs of partially nude and fully nude

11

women were located throughout the residence. Several of the photographs appeared to be of young women under the age of eighteen posing in sexually provocative positions. Multiple VHS tape, recordable DVD and 8mm tapes were recovered from the residence.

Alexander was taken into custody at 6215 S. Morningside Drive and transported to police headquarters where he was advised of his rights per Miranda Waiver Form 340 P.D. Alexander waived his rights and stated the surveillance cameras installed in his backyard were for security and liability purposes. Alexander said the camera in his bedroom was for fun. Alexander insisted everyone who visited his residence was aware of the cameras. Alexander stated the photographs of young girls found in his residence were fine art and inspiring.

Det. Brian Roach previewed the computer looking for evidence of an invasion of privacy and located child pornography, some of which Det. Roach knows as previously identified child victims.

Detectives started reviewing the videotapes recovered from the search warrant at 6215 Morningside Drive. On a VHS tape labeled by detectives as tape #10 a woman matching the victim's physical description was seen naked and engaging in sex with Alexander. The victim responded to Headquarters and viewed that portion of tape #10 and confirmed the woman on the tape is her and she stated that the sex was consensual however she was not aware she was being videotaped. The victim advised that the room she and Alexander are in is his bedroom.

(Government's Ex. 36; Defendant's Ex. E) The affidavit for the vehicle further provides:

In the driveway of 6215 Morningside Drive is a 2004 Black Chevy, Missouri license plate #832YTH. A computer check of the license plate reveals the vehicle is registered to Michael Alexander. Detectives believe there is a potential Alexander uses the vehicle to transport items from his residence to his place of employment. And that som [sic] of said listed items maybe [sic] contained in Alexander's vehicle.

(Government's Ex. 36) The affidavit for defendant Alexander's business further provides:

Big City Marketing is the business owned by Michael Alexander. The witness advised detectives that Alexander has a computer at Big City Marketing.

(Defendant's Ex. E)

22.     A Jackson County judge signed the Search Warrants for defendant Alexander's vehicle and business on October 17, 2006. (Government's Ex. 36; Defendant's Ex. E) The Search Warrants authorized officers to search for and seize the following property:

Digital storage devices consisting of all such equipment designed to collect,

12

analyze, create, display, convert, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data, to include but are not limited to desktop/laptop/hand held computers, PDA's (Personal Data Assistants), cellular telephones, pagers, digital cameras/camcorders and CCD concealable digital surveillance cameras and recorders, all of which may be hard-wired or wireless in operation and function;

Internal and peripheral storage devices, such as hard drives, floppy disks, zip disks, DVD-R/+R/RW and RAM, CR-R/CD-RW disks, data cartridges, compact flash memory cards, memory sticks, USB drives and other like magnetic media and non-volatile memory storage devices;

Peripheral input/output devices, such as a hard-wired and/or wireless network router, mouse, keyboard, printers, fax machine, digitizing tablet, stylus, scanner, video display monitor, head mounted displays, optical readers and reproducing devices capable of interfacing with computers and related communications devices that can be used to transmit or receive information to or from a computer.

Photographs, including still photos, negatives, videotapes, DVD's, films, undeveloped film and the contents therein and slides;

Any papers, correspondence, receipts or documents related to the victim;

(Government's Ex. 36; Defendant's Ex. E)

23.     Lisa Cole, defendant Alexander's neighbor, testified that one could view Alexander's hot tub from the second floor of houses around Alexander's residence. (Tr. I at 176) According to Ms. Cole, lights were on in Alexander's back yard all the time, even if nobody was back there. (Tr. I at 182)

## III.  DISCUSSION

Defendant seeks to suppress all evidence seized from his residence at 6215 Morningside Drive on October 14 and 15, 2006, from Big City Marketing at 801 West 47th Street on October 18, 2006 and from his 2004 Chevy Z-71 on October 19, 2006. (Motion to Suppress at 1)  In support of the motion, defendant makes the following arguments:

A.     The affidavits in support of the search warrants omit material facts, which, if added to the affidavits, would defeat probable cause (Motion to Suppress at 5-9);

B.     The warrants fail to particularly describe the place(s) or thing(s) to be searched (id. at 9-11);

C.     The October 15, 2006 warrant fails to particularly describe the items to be searched for and seized (id. at 11-12);

D.     There was no probable cause for the initial search of Mr. Alexander's home

13

computer (id. at 12-14);

E.       There was no probable cause to search Big City Marketing (id. at 14-15);

F.       There was no probable cause to search Mr. Alexander's vehicle (id. at 15);

G.      The search warrants were unconstitutionally overbroad (id. at 16-23);

H.      Officers exceeded the scope of the warrant (id. at 23-27);

I.       Police illegally arrested Mr. Alexander in his home (id. at 27-30); and

J.      Police violated Mr. Alexander's rights by interrogating him before providing Miranda warnings (id. at 30-31).

The Court will first address defendant Alexander's arguments dealing with the search warrants.

A.      <u>Search Warrants</u>

The United States Supreme Court has set forth the following with respect to what is required for a valid search warrant:

> The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." ... [T]his Court has interpreted [these words] to require only three things. First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense. Finally, "warrants must particularly describe the 'things to be seized,'" as well as the place to be searched.

<u>Dalia v. United States</u>, 441 U.S. 238, 255 (1979)(citations omitted).

1.      <u>There Was No Omission Of Material Facts In The Affidavits</u>

Defendant lists the following facts in his Motion to Suppress which defendant claims were omitted from the affidavits in support of all the search warrants:

1.      Victim (JC) had been in a romantic relationship with Alexander, during which she had consented to being photographed in the nude.

2.      Witness (ES) indicated that the tape showed victim (JC) entering the hot tub with Mr. Alexander.

3.      The detective fails to indicate whether witness' (ES') description of nudity meets the statutory definition required for a finding of invasion of privacy.

14

4.      The videos and DVDs located by witness (ES) were not hidden.

5.      Witness (ES) was aware that the pool area was monitored by cameras and had in fact previously viewed recorded footage of pool parties.[11]

6.      Witness (ES) indicated that she had never observed anything unusual on Alexander's computer and none of the equipment she observed on October 12, 2006, was connected to a computer or in the same room as the computer.[12]

(Motion to Suppress at 5)  Defendant alleges the following additional facts were omitted from the affidavit for his business, Big City Marketing:

1.      Victim (JC) was speaking in the context of a computer being located in Alexander's Home when she indicated that it was in "his office."

2.      Earlier searches related to the Invasion of Privacy investigation had revealed no connection between those alleged activities and any computer.

(Motion to Suppress at 5-6)

In addition to the alleged omissions listed by defendant in his motion, defense counsel listed additional alleged omissions at the hearing:

1.      JC had not seen any video (Tr. I at 10);

2.      While the affidavit indicates that JC had knowledge that defendant had taken plural videos of her in the nude, there was only a single video involving JC (Tr. I at 10);

3.      JC and ES had never met, so when ES found the video, she did not know who the woman in the video was (Tr. I at 10);

4.      In the affidavit, ES is alleged to have reviewed VHS videos and DVDs, but there was no activity or nakedness on the DVDs (Tr. I at 10-11);

5.      The affidavit indicates that there was a video camera hidden in the latticework near the hot tub, but ES did not tell the police it was hidden (Tr. I at 11);

6.      The affidavit indicates that ES said that she believed a third camera was located near the pool and lounging chairs based on one of the videos, but it was really based on the fact that ES had seen prior footage of parties that had been filmed at the

---

[11]Government counsel contends that this fact was not known to law enforcement until ES gave her written statement on October 15, 2006, the day after the first search warrant was obtained.  (Tr. I at 13-14)

[12]Government counsel contends that this fact was not known to law enforcement until ES gave her written statement on October 15, 2006, the day after the first search warrant was obtained.  (Tr. I at 14)

15

Alexander house (Tr. I at 11); and

7.      The affidavit indicates that on an unknown date, defendant had attempted to take a photograph of ES performing a sex act, but ES had really told the police that the date was earlier that week (Tr. I at 11-12).

The Eighth Circuit Court of Appeals has set forth the following with respect to warrant affidavits that are found to contain falsehoods or omissions:

A facially valid warrant affidavit is constitutionally infirm if the defendant establishes that the affidavit includes deliberate or reckless falsehoods that, when redacted, render the affidavit's factual allegations insufficient to support a finding of probable cause. Franks v. Delaware, 438 U.S. 154, 171 (1978).[13] Omissions likewise can vitiate a warrant if the defendant proves "first that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading, and, second, that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." United States v. Allen, 297 F.3d 790, 795 (8th Cir. 2002).

United States v. Ketzeback, 358 F.3d 987, 990 (8th Cir. 2004)(footnote supplied). The Ketzeback court set forth three steps to determine whether a warrant should be vitiated pursuant to Franks: (1) whether the officer intentionally omitted information from his affidavit; (2) whether the officer omitted the facts with the intent to mislead or in reckless disregard of the omissions' misleading effect; and (3) whether the officer's affidavit would not have been sufficient to support a finding of probable cause if the omitted facts had been included. Id. at 990-91.

The Court will address the alleged omissions:

1.      Victim (JC) had been in a romantic relationship with Alexander, during which she had consented to being photographed in the nude.

        The Affidavit clearly states that Alexander was the victim's "ex-boyfriend." (See Fact No. 3, supra) The fact that the victim may have consented at one time to being photographed in the nude by Alexander does not appear pertinent to the allegations that Alexander had videotaped the victim without her consent.

2.      Witness (ES) indicated that the tape showed victim (JC) entering the hot tub with Mr. Alexander.

_____

[13]In Franks v. Delaware, 438 U.S. 154, 155-56 (1978), the Supreme Court held that if it is shown by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

16

Defense counsel argues that Alexander cannot be charged with invasion of privacy because Alexander was with the victim so the victim could not have had an expectation of privacy because Alexander could obviously view her. (Tr. II at 42) Counsel misreads the statute which actually defines a "place where a person would have a reasonable expectation of privacy" to include any place where a reasonable person would believe that a person could disrobe in privacy, without being concerned that the person's undressing was being photographed or filmed by another. (See Fact No. 2, supra) The fact that Alexander was also pictured in the video is irrelevant.

3.      The detective fails to indicate whether witness' (ES') description of nudity meets the statutory definition required for a finding of invasion of privacy.

        The statutory definition of "nudity" includes the showing of all or any part of the human genitals or pubic area or buttock or any part of the nipple of the breast of any female person with less than a fully opaque covering. (See Fact No. 2, supra) The common meaning of the word "nude" is more than encompassed by the statutory definition.

4.      The videos and DVDs located by witness (ES) were not hidden.

        The affidavit does not state that they were hidden.

5.      Witness (ES) was aware that the pool area was monitored by cameras and had in fact previously viewed recorded footage of pool parties.

        The fact that the witness knew the pool area was monitored and that pool parties had previously been recorded does not appear pertinent to the allegation that Alexander had videotaped the victim at the hot tub without her consent or the allegation that videotapes were discovered of other women in the nude and performing sex acts who did not appear aware that they were being videotaped.

6.      Witness (ES) indicated that she had never observed anything unusual on Alexander's computer and none of the equipment she observed on October 12, 2006, was connected to a computer or in the same room as the computer.

        On October 15, 2006, the day after the first search warrant was obtained, the witness advised that although she had not personally observed anything unusual on Alexander's computer, she had been told by someone else that there were numerous porn sites on his computer history and that the porn encompassed everything from hard core pornography to child pornography. (Defendant's Ex. BB) The witness further advised that she had once asked to use Alexander's computer to check her e-mail and Alexander had remained close to her side, hovering, and did not leave the room until she was finished. (Id.) The fact that the equipment the witness observed was not connected to a computer or in the same room as a computer does not appear pertinent.

7.      Victim (JC) was speaking in the context of a computer being located in Alexander's Home when she indicated that it was in "his office."

        Defendant alleges this fact was omitted from the affidavit for his business, Big City

Marketing. The Court need not address the affidavit given to support the search of defendant Alexander's business as the Government has advised that nothing seized from the business will be used in the prosecution of the federal case. (See Government's Response in Opposition to Defendant's Motion to Suppress Evidence and Statements at 8) As there would be nothing to suppress, the portion of defendant's motion which seeks suppression of all evidence seized from his business is moot.

8. Earlier searches related to the Invasion of Privacy investigation had revealed no connection between those alleged activities and any computer.

Defendant alleges this fact was omitted from the affidavit for his business, Big City Marketing. The Court need not address the affidavit given to support the search of defendant Alexander's business as the Government has advised that nothing seized from the business will be used in the prosecution of the federal case. (See Government's Response in Opposition to Defendant's Motion to Suppress Evidence and Statements at 8) As there would be nothing to suppress, the portion of defendant's motion which seeks suppression of all evidence seized from his business is moot.

9. JC had not seen any video.

The affidavit does not state that JC, the victim, had seen the video. It states that she was contacted by Alexander's new girlfriend who stated she had located a video of the victim in the hot tub in the nude. (See Fact No. 3, supra)

10. While the affidavit indicates that JC had knowledge that defendant had taken plural videos of her in the nude, there was only a single video involving JC.

The affidavit does state that the victim reported that Alexander had taken "videos" of her in the nude without her consent, while JC actually reported that she had been told that a single video had been found of her in the nude. (See Fact No. 3, supra) This error does not appear to be particularly significant given that the witness advised that she had discovered additional videos of other women in the nude and performing sex acts who did not appear aware that they were being videotaped. (Id.)

11. JC and ES had never met, so when ES found the video, she did not know who the woman in the video was.

While JC and ES had never met, ES did not say that she did not know who the woman in the video was. Rather, ES told the officers that she was able to identify the woman in the video as a woman Alexander had dated previously who she knew as Jennifer. (Defendant's Ex. DD)

12. In the affidavit, ES is alleged to have reviewed VHS videos and DVDs, but there was no activity or nakedness on the DVDs.

ES did review both VHS videos and DVDs. While there was no activity or nakedness on the DVDs, the DVDs did contain images of the hot tub with no one in it. (Defendant's Ex. BB) Detective Johnson testified that she did not intend to mislead the judge into believing that sexual acts or nudity were found on the DVDs. (See Fact No. 3 at n.6, supra) This error does not appear to be particularly

18

significant as it does show that Alexander used DVDs to store images from his cameras.

13. The affidavit indicates that there was a video camera hidden in the latticework near the hot tub, but ES did not tell the police it was hidden.

ES told the officers that she located a camera on the lattice work above the hot tub. (Defendant's Ex. BB)  ES stated the camera was very small and not easily visible. (Id.)  The Court does not believe the affidavit misstates the witness' statement.

14. The affidavit indicates that ES said that she believed a third camera was located near the pool and lounging chairs based on one of the videos, but it was really based on the fact that ES had seen prior footage of parties that had been filmed at the Alexander house.

ES told the officers that while reviewing the VHS tapes and DVDs, she saw "an image of part of the pool with a couple of deck chairs and one scenario must have been during one of his pool parties.  There were a couple of women there with a beach ball.  The other one was Michael and a blonde woman that they were getting their towels; they headed inside." (Defendant's Ex. BB)  The fact that ES had seen footage of Alexander's fundraising pool parties does not change the fact that she also found either a VHS tape or DVD containing images from the pool area which led her to believe that there was a third camera.

15. The affidavit indicates that on an unknown date, defendant had attempted to take a photograph of ES performing a sex act, but ES had really told the police that the date was earlier that week.

ES did not give an exact date; she stated that Alexander had attempted to photograph her "earlier in the week."  (Defendant's Ex. BB)  The Court does not believe the affidavit misstates the witness' statement.

The Court does not believe that the officers omitted any pertinent information from the affidavits given to support the search of defendant Alexander's residence.  Certainly, no evidence has been presented to suggest that the officers intentionally omitted any pertinent information.

The Court finds that defendant Alexander did not meet his burden of establishing by a preponderance of the evidence that the officers misled Judge Midkiff by omitting information from the Affidavits and/or by including information in the Affidavits that they knew to be false or would have known to be false, except for a reckless disregard for the truth.

2.     Description Of The Places Or Things To Be Searched

Defendant argues that the particularity requirement of the Fourth Amendment was not met because the search warrants for defendant's residence merely gave the location as "6215

19

Morningside Drive," with no reference to the city, county or state.  (Motion to Suppress at 10)

The Fourth Amendment requires that warrants describe "the place to be searched" with particularity.  See United States v. Rogers, 150 F.3d 851, 855 (8th Cir. 1998), cert. denied, 525 U.S. 1113 (1999); United States v. Sherrell, 979 F.2d 1315, 1317 (8th Cir. 1992).  As set forth in Rogers, the test for determining the sufficiency of the description given in a search warrant is as follows:

> whether the place to be searched is described with sufficient particularity as to enable the officer executing the search warrant to locate and identify the place to be searched with reasonable effort and without a reasonable probability that another place might be mistakenly searched.

150 F.3d at 855.

The two search warrants in question (Government's Exs. 3 and 24), issued from the "State of Missouri, County of Jackson, in the Court of Kansas City, Missouri," provide the following description of the property to be searched:

> And it further appears that there is PROBABLE CAUSE to believe that said property subject to seizure is being kept or held **in this county and state** on the following person, place or thing, to-sit:

> Third house, south of 62nd Street on the east side of Morningside Drive.  A two-story single family dwelling white and brick with 6215 clearly written above the doorway. Two planters with flowers on the front porch with two white pillars on either side of the blue front door.  An enclosed single-story room on the south side of the residence

(Government's Exs. 3 and 24)  In the body of each Affidavit/Application for Search Warrant, Detective Johnson identified defendant Alexander's residence as "6215 Morningside Drive, Kansas City, Jackson County, Missouri."  (Government's Exs. 2 and 23)

After Detective Johnson obtained the first search warrant, she went to the Metro Patrol Station and contacted the Tactical Response Team to do a debriefing before the execution of the warrant.  (See Fact No. 5, supra)  Detective Johnson went with the Tactical Response Team and drove by the house to confirm that the information on the search warrant corresponded with the house.  (Id.)

The Court finds that the search warrants described the place to be searched with sufficient particularity.  In addition, Detective Johnson's actions in taking the Tactical Response Team past

20

the residence prior to the execution of the warrant negated any chance that another place might be mistakenly searched. Defendant's argument as to the particularity of the place to be searched for the search warrants on his residence must fail.

Defendant next argues that the particularity requirement of the Fourth Amendment was not met on the search warrant issued on the application of Detective Brian Walton. (Motion to Suppress at 10-11) That search warrant authorized officers to search the following property for evidence of child pornography:

> Cameras to include film and digital media
> 5 video cameras w/ wires
> 3 televisions, 2 with wires attached
> VCR
> DVD/VCR combination
> Audio receiver/recorder
> VHS Videotapes
> DVD Videos
> DVD-Rs
> 8mm tapes
> Photographs and negatives
> Dell Laptop
> Digital camera disk
> Blackberry telephone

(See Fact No. 16, supra) Defendant argues that because the warrant provides no information as to where these items might be found for execution of the warrant and no information as to the ownership of these items or identifying serial numbers, the search warrant is invalid. (Motion to Suppress at 10-11)

The Court finds that the search warrant for storage media must be placed in context. On October 14, 2006, at 10:43 p.m., Judge Midkiff signed a search warrant for defendant Alexander's residence. (See Fact No. 4, supra) The last sentence of the search warrant provides: "After execution of the Search Warrant, the Warrant with a Return thereon, signed by the officer making the search, shall be delivered to the Judge who issued the Warrant, together with an Itemized Receipt for said property taken." (Government's Ex. 3) The Return/Receipt for Search Warrant shows that the following items were seized during the execution of the search warrant on October 14:

> Daewoo Television Serial #GT36EA2373 Model #DTQ13V5FC

Dell Inspiron laptop computer Serial #0107899029300375 with power cord and
    camera adaptor
512 Magabute camera disk
Blackberry T-Mobile telephone
Cannon PC1150 digital camera Serial #0723355939 with memory card inside
Credit card statements
2.4 GHZ High speed wireless cordless adaptor DWL-G650 BN2K443009803
Day Planner and notebook
Cables to connect DVD player to Receiver
Power cords
Photographs
Negative of photographs
Canera Ricoh 35 mm camera YF-20N
Minolta Maxxum 33 mm camera 430SI RZ Serial #96804854
Kodak Gold film
Receipts
San Dish Cruzer 1.0 GB memory stick
Three remote controls for television/VCR
Black bag
Sharp TV/VCR combo Model #13VT-H60 Serial #576596
Sanyo VCR Model #VWM-900
Panasonic VHS/DVD recorder Model #DMR-ES40V Serial #LJ5LC005404
Sony audio/video receiver Serial #8845734
Toshiba TV/VCR combo Model #MV13P3 Serial #79406480B
Magazine
4 small cameras with wires
44 VHS tapes
62 DVDs
4 8mm videotapes
Multiple new recordable DVDs

(See Fact No. 10, supra)  On October 15, Judge Midkiff was presented with a second

Affidavit/Application for Search Warrant for defendant Alexander's residence and with an

Affidavit/Application for Search Warrant for the storage media.  (See Fact No. 15, supra)  The

probable cause statements provided in each of the affidavits is identical to the probable cause

statement provided in the October 14 affidavit for the first search warrant for Alexander's residence,

with the addition of one sentence.  (Id.)  The last sentence of the October 15 probable cause

statements reads in part:  "Det. Brian Roach conducted a preview of the computer recovered from

6215 S. Morningside Drive and located child pornography ..."  (Id.)

It is clear to the Court (and to any officers executing the warrant) that the items listed in the

October 15 search warrant for storage media refer to: (1) those items already seized from defendant

Alexander's residence on October 14 and in the possession of the Kansas City, Missouri Police

Department; and (2) those items that might be seized from Alexander's residence as a result of the October 15 search warrant for his residence. The Court finds no reasonable probability that other storage media might be mistakenly searched. Defendant's argument as to the particularity of the place to be searched for the search warrant for storage media must fail.

### 3. Description Of The Items To Be Searched For And Seized

Defendant argues that the particularity requirement of the Fourth Amendment was not met on the October 15 search warrant for storage media because it listed the property subject to search and seizure as merely "Child pornography." (Motion to Suppress at 11) According to defendant, "[b]ecause not all depictions of minors in a state of full or partial nudity qualify as child pornography, the term is not sufficiently particular to meet Fourth Amendment strictures." (Id. at 11-12)

The constitutional standard for particularity of description in a search warrant is met if "the description is sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the ... objects to be seized." United States v. Coppage, 635 F.2d 683, 686-87 (8th Cir. 1980)(citing Steele v. United States, 267 U.S. 498, 503-04 (1925)). "'The degree of specificity required will depend on the circumstances of the case and on the type of items involved.' [United States v. Horn, 187 F.3d 781, 788 (8th Cir. 1999).] The particularity requirement 'is a standard of 'practical accuracy' rather than a hypertechnical one.' United States v. Peters, 92 F.3d 768, 769-70 (8th Cir. 1996)." United States v. Summage, 481 F.3d 1075, 1079 (8th Cir. 2007).

The use of generic terms for child pornography in a search warrant has been found sufficient as set forth by the Fourth Circuit Court of Appeals in United States v. Sassani, 1998 WL 89875 (4th Cir. Mar. 4, 1998), cert. denied, 525 U.S. 921 (1998):

> Unlike with murder weapons or drugs, when an offense concerns the use of hard copy or electronic files and documents a court cannot be sure which files will be relevant and the warrant may not be able to state as specifically what should be searched and seized. Therefore, courts have required less particularity in the warrant. United States v. Torch, 609 F.2d 1088, 1090 (4th Cir. 1979). Courts have acknowledged the need for the use of generic terms in warrants seeking evidence of child pornography and have upheld more generally-worded warrants so long as the warrant limits the discretion of the officers conducting the search. See Torch, supra,

23

609 F.2d at 1090 (holding sufficient a warrant for "records, documents and writings related to the transportation, sale and distribution in interstate commerce of lewd, lascivious and filthy films"); United States v. Layne, 43 F.3d 127, 132-33 (5th Cir.1995)(upholding two warrants describing materials to be sought and seized as follows: "assorted pornographic videotapes; assorted pornographic magazines; assorted devices;" and, in the second warrant, "Child pornography; records of victims; drawings; pictures; computer disks, sexual devices; videotapes; child abuse books; magazines; audiotapes; and any other obscene or child pornographic material;" finding the warrants sufficiently limited officers' discretion in searching); United States v. Kimbrough, 69 F.3d 723, 727 (5th Cir.1995)(finding sufficiently particular warrants' authorization for seizure of "'bills, correspondence, receipts, ledgers, Postal receipts and telephone records all of which show orders and deliveries to or from any known foreign or domestic distributer of child pornography'") ...

Sassani, 1998 WL 89875 at *5. See also United States v. Layne, 43 F.3d 127, 133 (5th Cir.), cert. denied, 514 U.S. 1077 (1995)(the term "child pornography" sufficiently guided police officers executing warrant to know what items could be seized; the words "need no expert training or experience to clarify their meaning.")

The Court finds that the officers were sufficiently guided by the use of the term "child pornography." Defendant's argument as to the particularity of the description of items to be seized must fail.

### 4. Probable Cause To Search Computer

Defendant sets forth the following argument with respect to the alleged lack of probable cause to search his computer:

> The affidavit in question provides information that multiple video cameras were used to make several recordings of individuals who may or may not have been aware of the tapings. The affidavit alleges that a witness found two video cameras, one of which was connected to the television in the master bedroom, and multiple VHS tapes and DVD's of persons engaged in sexual activity. The tapes and DVD's were found in the television cabinet in the master bedroom. The affidavit contained no information that the video equipment was or had been connected to a computer. Similarly, the tapes and DVD's were not alleged to have been found near a computer, which not incidentally, was not located in the master bedroom. Despite the failure of the affidavit to establish any nexus to a computer, the warrant authorized seizure of computers and various computer equipment.

> Detective Johnson's affidavit made no assertion that Mr. Alexander may be storing evidence of invasion of privacy on his computer and offered the issuing judge no explanation as to why she included computers and computer equipment in her application.

(Motion to Suppress at 12-13)

24

The affidavit supports the inference that defendant Alexander uses a variety of means to record and store images. The affidavit mentions a video camera hooked up to a recording device which displayed on the television in Alexander's bedroom, VHS videos, DVDs, a second video camera hidden in the lattice work above the hot tub in Alexander's back yard, a third camera located near the pool and lounging chairs, and a digital camera. (See Fact No. 3, supra) Defendant Alexander's use of a digital camera to record the same type of activity he also recorded on videotape provides probable cause to search a storage media (i.e. a computer) that would accommodate digital images. See United States v. Flanders, 468 F.3d 269, 271-72 (5th Cir. 2006)(use of digital camera to photograph naked child whom defendant had allegedly previously sexually exploited supported probable cause for search of home computer).

The Court finds that probable cause existed to search defendant Alexander's computer.

5.    Probable Cause To Search Defendant's Vehicle And Business

The Court need not address whether probable cause existed to support the search warrants for defendant Alexander's vehicle and business as the Government has advised that no evidence relative to the instant federal prosecution was seized from the vehicle or business. (See Government's Response in Opposition to Defendant's Motion to Suppress Evidence and Statements at 7-8) As there would be nothing to suppress, those portions of defendant's motion which seek suppression of all evidence seized from his vehicle and business are moot.

6.    The Search Warrants Were Not Unconstitutionally Overbroad

Defendant sets forth the following argument with respect to the allegation that the search warrants were unconstitutionally overbroad:

> ... the warrants to search Mr. Alexander's property contain a long list of items to be seized that provides no meaningful limitation. The items listed in the warrants make up a half-page, laundry list of virtually every piece of computer-related equipment that could be expected to be found in the home of the average computer user. The warrants make no reference to the crime(s) for which the issuing judge has found probable cause and do not incorporate the affidavits by reference. As a result, the list of items subject to search and seizure provides no guidance and does not condition seizure upon a relationship between the particular piece of equipment and the crime(s) alleged. Though the "papers, correspondence, receipts or documents" authorized to be seized are those "related to the victim," her identify is not listed

anywhere in the warrant. ... The lists if items in the instant warrants provide no guidance to the executing officers as to which computer equipment or documents are subject to seizure.

(Motion to Suppress at 19-20)

As set forth above, the constitutional standard for particularity of description in a search warrant is met if "the description is sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the ... objects to be seized." United States v. Coppage, 635 F.2d 683, 686-87 (8th Cir. 1980)(citing Steele v. United States, 267 U.S. 498, 503-04 (1925)). "'The degree of specificity required will depend on the circumstances of the case and on the type of items involved.' [United States v. Horn, 187 F.3d 781, 788 (8th Cir. 1999).] The particularity requirement 'is a standard of 'practical accuracy' rather than a hypertechnical one.' United States v. Peters, 92 F.3d 768, 769-70 (8th Cir. 1996)." United States v. Summage, 481 F.3d 1075, 1079 (8th Cir. 2007).

In a recent case before the United States District Court for the Northern District of Iowa, United States v. Gocha, 2007 WL 2379721 (N.D. Iowa Aug. 10, 2007), the court analyzed the defendant's argument that the warrants were unconstitutionally overbroad:

> With regard to Gocha's claim that the warrants were defective because they failed to provide adequate guidance to the officers regarding the specific information being sought, the Government cites the recent Eighth Circuit case of United States v. Summage, 481 F.3d 1075 (8th Cir. 2007) ... In Summage, the defendant, charged with producing and possessing child pornography, challenged a warrant that listed the property to be seized in a general manner, including: "[a]ll videotapes and DVD's;" "pronographic (sic) pictures;" "[a]ll video and/or digital recording devices and equipment;" "[a]ll equipment that is used to develope (sic) and/or upload/download photographs and/or movies" and "computers(s)." Summage, 481 F.3d at 1077.

> In finding the warrant to be sufficiently particular with regard to the items to be seized, the Summage court recognized that at the time officers apply for a warrant, they often know only that potentially incriminating evidence is likely to exist; they do not know the particular electronic format in which the evidence may be maintained by the suspect. See Summage 481 F.3d at 1079. Although Summage was decided in a different context, the same reasoning applies here. The officers in this case had no knowledge of the particular form in which Gocha might be maintaining evidence of his drug activities, requiring them to search the entirety of Gocha's computer files, digital media, and storage devices. Given the multiple types of evidence and means of storage described by Deputy Beaver in his affidavit, it is difficult to imagine how the warrants could have met the level of particularity Gocha seems to suggest. As the Summage court observed, "[t]he requirement of particularity must be assessed in terms of practicality." Id. The court finds [the]

search warrants ... met the particularity requirement and were not overly broad. Gocha, 2007 WL 2379721 at *7.

The Court finds that the search warrants in this case must be read in conjunction with their corresponding affidavits.[14]  When this is done, it is clear that the items to be searched and seized pursuant to the first warrant relate to the crime of invasion of privacy (that is the nonconsensual taping of nudity or sexual acts by video or digital sources, to the victim of the tapings, and to the defendant's connection to the residence where the tapings occurred) and the items to be searched and seized pursuant to the second warrant further relate to the crime of child pornography.  The affidavit in support of the first search warrant shows that defendant Alexander uses a variety of means to record and store images.  The affidavit mentions a video camera hooked up to a recording device which displayed on the television in Alexander's bedroom, VHS videos, DVDs, a second video camera hidden in the lattice work above the hot tub in Alexander's back yard, a third camera located near the pool and lounging chairs, and a digital camera.  (See Fact No. 3, supra)  The affidavit in support of the second search warrant adds that child pornography was discovered on Alexander's computer.  (See Fact No. 15, supra)  Given the difficulty in determining the particular format in which defendant Alexander may have maintained evidence relating to invasion of privacy or child pornography, the Court finds the warrants to be sufficiently particular with regard to the items to be seized.

7.    The Scope Of The Warrants

A description of the items to be seized in a search warrant provides for the scope of the items subject to seizure.  Defendant Alexander argues that the following items seized from his residence[15]

---

[14]While the victim's name is not set forth in the affidavits, it is clear that the officers executing the warrants knew or had access to her name when they were searching for "[a]ny papers, correspondence, receipts or documents related to the victim."

[15]Defendant Alexander also argues that the officers exceeded the scope of the warrants for his vehicle and his business.  (Motion to Suppress at 24)  As set forth above, the Government has advised that no evidence relative to the instant federal prosecution was seized from the vehicle or business.  (See Government's Response in Opposition to Defendant's Motion to Suppress Evidence and Statements at 7-8)  As there would be nothing to suppress, those portions

27

were not within the scope of the warrants, and therefore, not authorized to be seized:

- October 14, 2006 return–Television sets, cables to connect DVD player to receiver, power cords, receipts;

- October 15, 2006 return–miscellaneous papers, black bag with woman's panties;

(Motion to Suppress at 24)  In addition, defendant argues that e-mails read and seized from his home on October 15, 2006, and the preview of his computer exceeded the scope of the first warrant.  (Id. at 24-25)

Given the affidavit's recitation of a video camera hooked up to a recording device which displayed on the television in Alexander's bedroom, VHS videos, DVDs, a second video camera hidden in the lattice work above the hot tub in Alexander's back yard, a third camera located near the pool and lounging chairs, and a digital camera, the seizure of the listed television sets, cables to connect DVD player to receiver and power cords can be justified as potential instrumentalities of the offense.  "It is well established that '... instrumentalities and means by which a crime is committed' are among the classes of items which may be seized under the authority of a search warrant although their presence was not specified in the warrant."  United States v. Bridges, 419 F.2d 963, 967 (8th Cir. 1969).

The officers seized "receipts" and "2 misc. papers."  (See Fact Nos. 10 and 18, supra)  The search warrants authorized the seizure of:  "Any papers, correspondence, receipts or documents related to the victim; Indicia of occupancy, residency, ownership, management and/or control of the premises or property described above including, but not limited to utility and telephone bills, and canceled envelopes.  Day Planner and address book."  (See Fact Nos. 4 and 16, supra)  Defendant has provided no evidence to suggest that these items were seized in bad faith, rather than in a mistaken belief that they might fall within the scope of the warrant.  As set forth in United States v. Johnson, 2007 WL 2303613 (W.D. Mo. Aug. 8, 2007):

---

of defendant's motion which seek suppression of all evidence seized from his vehicle and business are moot.

> [R]equiring law enforcement officers to fully determine the specific relevance or criminality of each document or item identified as subject to seizure pursuant to the warrant is impractical. Officers in this case seized evidence that appeared on its face to be relevant and within the scope of the issued warrant, and later reviewed such items at their offices. It is unrealistic to assume that all evidence seized by law enforcement officers executing a warrant will necessarily be specifically relevant to the case.

Johnson, 2007 WL 2303613 at *4.

One of the printed out e-mails read and seized by the officers begins: "Hello, michael j! Recently you made request to join our child porno site ..." (Government's Ex. 8b) The officers recovered this e-mail from defendant Alexander's desk. Police officers executing a search warrant may seize items of evidence not listed in the warrant if discovered during the reasonable course of the search and the object's incriminating character is immediately apparent. See United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997)(homemade silencer, although not described in the search warrant, was properly seized on 'plain view' grounds during the execution of the warrant"). The officers were justified in searching Alexander's desk for items listed in the warrant. It would have been immediately apparent to the officers that this e-mail constituted evidence of criminal activity and was, therefore, appropriately seized.

With respect to the preview of defendant Alexander's computer, the Court finds that the original search warrant must be read in conjunction with its corresponding affidavits. When this is done, it is clear that the items to be searched and seized relate to the crime of invasion of privacy (that is the nonconsensual taping of nudity or sexual acts). Detective Roach was asked to review the computer for any evidence of invasion of privacy. (See Fact No. 14, supra) Detective Roach was to look for any evidence attributed to the cameras that were mounted throughout Alexander's residence. (Id.) Within minutes, Detective Roach came across what appeared to him to be child pornography. (Id.) Detective Roach stopped his search and told Detective Johnson that it would be best if they obtained a search warrant for child pornography. (Id.) Detective Roach's actions cannot be characterized as exceeding the scope of the warrant. See United States v. Welch, 401 F.Supp.2d 1172, 1180 (D. Kan. 2005)("Because the officer sought a second warrant after finding

a minimal number of images containing child pornography, he did not exceed the scope of the ... warrant.")

Finally, the seizure of a black bag with woman's panties probably exceeded the scope of the October 15 warrant.  As set forth in <u>United States v. Rozell</u>, 2004 WL 2801591, *3 (D. Minn. Nov. 19, 2004)(quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 43 (1984)), "where items are unlawfully seized but the places searched do not exceed the limits of the warrant, as long as the unlawfully seized items are suppressed, 'there is certainly no requirement that lawfully seized evidence be suppressed as well.'"  The Government has advised that it does not intend to use this evidence in the instant prosecution.  (<u>See</u> Government's Response in Opposition to Defendant's Motion to Suppress Evidence and Statements at 28)  As there would be nothing to suppress, the seizure of the black bag with woman's panties is a moot issue.

The Court finds that for the most part, the items seized by the officers fell within the scope of the warrants.  Defendant's argument relating to the scope of the warrants must fail.

8.     <u>The Leon Good Faith Exception</u>

Even if probable cause did not exist for the warrants at issue (which this Court does not believe to be the case) or if the items set forth in the warrants were too general, the <u>Leon</u> good faith exception would support the admissibility of the evidence seized pursuant to the warrants since it appears that the officers executing the warrants were acting in "objectively reasonable reliance" on a warrant issued by a neutral judge.  <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984); <u>United States v. Murphy</u>, 69 F.3d 237, 241 (8th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1153 (1996).  Judge Midkiff found probable cause for the issuance of the warrants.

The Eighth Circuit has set forth the following with respect to exceptions to good faith reliance:

> Ordinarily, a police officer cannot be expected to question a judge's probable cause determination.  Suppression is an appropriate remedy if the judge, in issuing the warrant, was misled by information in the affidavit that the affiant knew or would have known it was false except for the affiant's reckless disregard for the truth.  Evidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause.

30

<u>Murphy</u>, 69 F.3d at 241 (quoting <u>United States v. Gibson</u>, 928 F.2d 250, 253-54 (8th Cir. 1991)). Stated another way, there are four "exceptions" wherein reliance upon an invalid search warrant is per se unreasonable: (1) the affiant misled the judge by including information in the affidavit that the affiant knew was false or would have known was false, except for a reckless disregard for the truth; (2) no reasonably well-trained officer could rely on the warrant, as it was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (3) the judge wholly abandoned his neutral and detached position and acted as a rubber stamp; or (4) the warrant itself is so facially defective that the executing officer cannot presume its validity. <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897, 922-23 (1984).

The "exceptions" to good faith reliance do not apply in this case. As set forth above, the Court found no evidence to suggest that the officers misled Judge Midkiff by including information in the affidavits that they knew to be false or would have known to be false, except for a reckless disregard for the truth. No evidence was presented to suggest that Judge Midkiff abandoned her neutral and detached position or acted as a rubber stamp. Further, the Court cannot find that the affidavits were so lacking any indicia of probable cause or the warrants so facially defective that the executing officers could not presume the warrants' validity.

    B.    <u>Defendant Alexander's Arrest</u>

Defendant argues that arresting a person in his home without an arrest warrant is impermissible pursuant to <u>Payton v. New York</u>, 445 U.S. 573 (1980). (Motion to Suppress at 27) According to defendant, if the police believed they had probable cause to arrest him before breaking down the door to his home, they could have sought an arrest warrant. (<u>Id.</u> at 28) Instead, police arrested him immediately upon entering his home without an arrest warrant and before they discovered additional probable cause while executing the search warrant. (<u>Id.</u>) Defendant argues that the exclusion of evidence gained as a result of the unlawful arrest is the appropriate remedy. (<u>Id.</u>)

A similar argument was made and rejected in <u>Russell v. Harms</u>, 397 F.3d 458 (7th Cir. 2005).

31

The court found:

> In <u>Payton v. New York</u>, 445 U.S. 573 (1980), the Supreme Court held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." <u>Id.</u> at 576. It went on to note that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." <u>Id.</u> at 603. <u>Payton</u> did not hold, however, that an arrest warrant is the exclusive basis upon which police may arrest a suspect in her home. The Court noted that an arrest warrant would suffice in response to an argument raised by the government that requiring a search warrant under those circumstances would impose an unreasonable burden upon law enforcement. <u>Id.</u> at 602. If anything, <u>Payton</u> suggests that officers in possession of a search warrant have gone above and beyond what the Fourth Amendment requires before they may arrest a resident in her home. Several of our fellow Circuits have read <u>Payton</u> this way, finding a search warrant sufficient in these circumstances. <u>See</u> <u>United States v. Winchenbach</u>, 197 F.3d 548, 553 (1st Cir. 1999)(police may arrest an individual in her home without an arrest warrant "as long as they are lawfully on the premises (by reason, say, of a search warrant) and probable cause exists"); <u>Mahlberg v. Mentzer</u>, 968 F.2d 772, 775 (8th Cir. 1992); <u>Jones v. City of Denver</u>, 854 F.2d 1206, 1209 (10th Cir. 1988). ... We agree with the reasoning of these authorities and hold that police executing a valid search warrant may arrest a resident found within the permissible scope of that search if the officers have probable cause to believe that the resident has committed a crime. <u>Cf.</u> <u>United States v. Price</u>, 888 F.2d 1206, 1209 (7th Cir. 1989)(implicitly recognizing this principle). Moreover, the evidence known to the police when they applied for the warrant also gave them probable cause to believe that both Russell and Davis were committing theft. Defendants therefore were justified in arresting plaintiffs when they found them at home at the time of the search.

<u>Russell</u>, 397 F.3d at 466. <u>Accord</u> <u>United States v. Sherrill</u>, 27 F.3d 344, 346-47 (8th Cir.)(affidavit for warrant to search defendant's home could provide probable cause to arrest defendant even prior to search), <u>cert.</u> <u>denied</u>, 513 U.S. 1048 (1994); <u>United States v. Akins</u>, 2007 WL 1018761, *5-6 (E.D. Mo. Apr. 2, 2007)(same).

The Court finds that the officers had probable cause to arrest defendant Alexander when they found him at home at the time of the search for the crime of invasion of privacy based on the information that had been provided to the officers by the witness and the victim. Defendant's argument that his subsequent statements should be suppressed as a result of the unlawful arrest must fail.

C.  <u>Defendant Alexander's Interrogation</u>

Defendant argues that "[a]bsent a showing that **Miranda** warnings were given in advance

32

of questioning, Mr. Alexander's statements must be suppressed." (Motion to Suppress at 31)

As set forth above, defendant Alexander signed a Miranda Waiver at 6:08 a.m. on October 15, 2006, and agreed to talk to the officers. (See Fact No. 12, supra) There is no evidence before the Court that defendant made any statements prior to the execution of this waiver. Defendant's argument must fail.

IV.  CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Michael Alexander's Motion to Suppress (doc #36).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

<u>/s/ Sarah W. Hays</u><br>
SARAH W. HAYS<br>
UNITED STATES MAGISTRATE JUDGE